IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:95-cr-58 (LMB) |
| | ) | |
| | ) | |
| LEWIS LEE aka STEVEN PANTOJA,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Through counsel, defendant Lewis Lee, also known as Steven Pantoja ("defendant" or

"Pantoja") has filed an Emergency Motion for Compassionate Release ("Motion") in which he

seeks to be released from prison because of his unique history, the coronavirus outbreak in his

facility, and his underlying health conditions. The government opposes the Motion. For the

reasons that follow, the Motion will be granted and defendant will be ordered released after a 14-

day quarantine to begin his three-year term of supervised release, with the additional special

condition that he remain in home confinement until January 24, 2023, the date his term of

incarceration would otherwise have expired.

I.

Defendant, who is 46 years old, has been incarcerated for almost 30 years as a result of

two acts committed when he was 16 and 20 years old. Defendant had an extremely difficult

childhood, obtained only a fourth-grade level education, and never learned to read or write. Id.

Pantoja reports that he began drinking alcohol when he was only eight years old, and started

---

[1] Defendant's legal name is Steven Pantoja; however, before his incarceration, defendant used
the alias "Lewis Lee," which has been used in lieu of defendant's legal name on a variety of
official documents, including in this matter.

using marijuana shortly thereafter. Id. Defendant was also hospitalized many times as a child, including for a head injury when he was between 10 and 12 years old and for multiple convulsive seizures. Id. at 10. As a result, defendant now presents with both short- and long-term memory loss and impaired comprehension. Id.

When defendant was 13, he began selling drugs to make money. Id. In January 1990, when defendant was 16 and on a trip to Washington, D.C. to sell drugs, he shot and killed a man who he apparently believed to be a "hit man" who was "going to do something to [him]." Id. at 11. Defendant was arrested on December 27, 1990, and was shuttled between the D.C. Jail and St. Elizabeth's Hospital for the next three years. Id. On multiple occasions, the Superior Court for the District of Columbia found defendant incompetent because he lacked an understanding of the proceedings and could not communicate with counsel, but the court ultimately concluded that through tutoring this issue could be remedied. Id. On September 29, 1993, defendant pleaded guilty in that court to second-degree murder while armed. On November 18, 1993, defendant was sentenced to 15 years to life incarceration, with a mandatory minimum sentence of five years' imprisonment. Id. at 12.

After his sentencing, defendant was sent to the Maximum-Security Facility at the Lorton Correctional Complex in Fairfax, Virginia, which then served as the District of Columbia's prison and which was often described as a "hellhole" in which violence flourished. Id. On September 14, 1994, when defendant was 20 years old, he stabbed another inmate with a homemade knife. Id. Based on this offense, on February 9, 1995, a federal grand jury in the Eastern District of Virginia returned a three-count indictment charging defendant with assault with a deadly weapon, assault with the intent to cause serious bodily harm, and possession of a knife not authorized by the warden of a maximum-security correctional facility, respectively in

2

violation of 18 U.S.C. §§ 113(c), (f), and 13. [Dkt. No. 37] at 2. On April 10, 1995, defendant

pleaded guilty to the first count, for which he was sentenced to 41 months, to be served

consecutively to his District of Columbia sentence and to be followed by three years of

supervised release. [Dkt. No. 23-10].[2]

During nearly 30 years of incarceration, defendant has shown significant rehabilitation.

His disciplinary history has been almost perfect; he has incurred only four minor, non-violent

infractions, and no infractions for almost seven years. [Dkt. No. 23-13]. The Bureau of Prisons

("BOP") has consistently recognized defendant's positive development. In 2017, the BOP

recommended that defendant be granted extra meritorious good time. [Dkt. No. 23-14]. Other

BOP records indicate defendant receiving a Public Security Factor waiver and a security

classification of "Medium," although his crime and sentence would ordinarily result in a "High"

security classification. [Dkt. No. 23-15]. In 2018, defendant's case manager and unit manager

reported that his adjustment "has been excellent" and that defendant has "developed good

rapport with staff and inmates alike." Id. A clinical psychologist who evaluated defendant earlier

this year concluded that "he is not at imminent risk of engaging in violence toward himself or

others," and "does not demonstrate traits that would be indicative of longer-term public safety

risk." [Dkt. No. 26-4] at 3.

Defendant has also improved himself through work and the completion of numerous

educational programs. Over the last two years alone, defendant has completed 57 hours of

educational and vocational programming, including programs related to searching for jobs and

drug education. [Dkt. No. 23-16]. Defendant has also completed the BOP's Challenge Program,

---

[2] The sentencing judge was the Honorable Albert V. Bryan, Jr., who recently passed away.

which is designed to facilitate reintegration into the community through the elimination of drug abuse and the elimination or management of mental illness. [Dkt. No. 23-17].

In recognition of his significant rehabilitation, in November 2019, the United States Parole Commission ("USPC") granted defendant parole for his 1993 conviction effective February 28, 2020, concluding that "there is a reasonable probability that [defendant] will live and remain at liberty without violating the law" and that his "release is not incompatible with the welfare of society." [Dkt. No. 23-19]. In reaching that decision, the USPC cited defendant's positive institutional record, and his case manager's report that she had no concerns about his compliance with institutional rules. [Dkt. No. 23-16]. Defendant will remain on parole for the rest of his life. [Dkt. No. 23-19].

On February 28, 2020, defendant began serving the consecutive 41-month sentence imposed by this court [Dkt. No. 23] at 32. Defendant is currently incarcerated in the District of Columbia jail ("D.C. Jail") and was scheduled to be transferred to Federal Correctional Institution Coleman once he had concluded meeting with his counsel; however, the BOP has suspended all inter-facility transfers due to the coronavirus, and defendant has therefore been unable to transfer to a federal facility. [Dkt. No. 37] at 3.

The D.C. Jail has experienced a major outbreak of the coronavirus. As of May 15, 2020, the rate of infection in the facility was 13.5 percent, which is almost 14 times higher than the rate of infection for District of Columbia residents. Banks v. Booth, No. 20-cv-849, 2020 WL 3303006, at *6 (D.D.C. June 18, 2020). In March 2020, a class action lawsuit was brought against the District of Columbia Department of Corrections ("DOC") alleging that the conditions in the D.C. Jail violate inmates' rights under the Fifth and Eighth Amendments of the United States Constitution. Id. On June 18, 2020, the inmates' motion for a preliminary injunction was

4

granted in part, after the court concluded that there is "evidence that inadequate precautionary measures at DOC facilities have increased [inmates'] risk of contracting COVID-19 and facing serious health consequences, including death," and ordered the DOC to make a variety of changes to its procedures. Id. at *16.

Defendant, who suffers from diabetes, hypertension, and hyperlipidemia, and has a family history of heart disease, contracted the coronavirus on May 23, 2020. [Dkt. Nos. 26-3, 34]. Although he has been largely asymptomatic, his counsel reports that he was returned to his unit after spending just 10 days under observation for symptoms of the virus, and is not scheduled to receive follow-up care for another three months. [Dkt. No. 39].

II.

Under 18 U.S.C. § 3582(c)(1)(A)(i), a defendant is only permitted to file a motion for compassionate release in federal court after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Id. "Warden" is defined as "the chief executive officer of a U.S. Penitentiary, Federal Correctional Institution, Medical Center for Federal Prisoners, Federal Prison Camp, Federal Detention Center, Metropolitan Correctional Center, or any federal penal or correctional institution or facility" or "any staff member with authority explicitly delegated by any chief executive officer." 28 C.F.R. § 500.1(a). Because defendant is not incarcerated in a BOP facility, the warden of his facility does not meet this definition. Although defendant requested compassionate release from the warden of the D.C. Jail on May 14, 2020, that warden has no authority to grant such relief. [Dkt. No. 23] at 25; [Dkt. No. 34]. Moreover, due to lockdowns caused by the coronavirus, defendant cannot be transported to a BOP facility at which he could

petition the warden for compassionate release. Accordingly, defendant cannot reasonably be expected to comply with the exhaustion requirement.

The government "acknowledges that [d]efendant is in a Catch-22," but suggests that defendant should take the "unorthodox" step of submitting a "request to BOP officials notwithstanding his current circumstances," and then re-file a motion in this Court 30 days thereafter if, as is likely, the BOP does not release defendant within that timeframe. [Dkt. No. 37] at 6-7. Requiring defendant to undergo this effectively symbolic process would not just be unorthodox; it would almost certainly be futile, inadequate, and subject defendant to undue prejudice. See Poulios v. United States, No. 2:09-cr-109, 2020 WL 1922775, at *1-*3 (E.D. Va. Apr. 21, 2020) (finding that the exhaustion requirement may be waived if "(1) the relief sought would be futile upon exhaustion; (2) exhaustion via the agency review process would result in inadequate relief; or (3) pursuit of agency review would subject the petitioner to undue prejudice"); United States v. Jepsen, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at *3 (D. Conn. Apr. 1, 2020) (finding that a defendant's motion was "properly before the Court" because he "is essentially caught in a 'Catch-22'; neither the warden at Wyatt nor the BoP will consider his request because of his designation to Wyatt, a non-BoP facility"). Accordingly, the administrative exhaustion requirement will be waived, and defendant's motion can be considered on the merits.

III.

18 U.S.C. § 3582(c)(1)(A) provides that a sentencing court "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--(i) extraordinary and compelling reasons warrant such a reduction" "and that such a

reduction is consistent with applicable policy statements issued by the Sentencing Commission." Id. Defendant satisfies these requirements.

Although United States Sentencing Guidelines § 1B1.13 provides examples of "extraordinary and compelling reasons" that may warrant a sentence reduction, this Court has previously "join[ed] the many other district courts that have concluded that 'a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C).'" United States v. Chatelain, No. 1:19-cr-133 [Dkt. No. 73] at 4 n.5 (quoting United States v. Redd, No. 1:97-cr-6, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) (collecting cases)).

Extraordinary and compelling reasons are present in this case. There has been a major outbreak of the coronavirus in defendant's facility. As of the date of defendant's motion, the D.C. Jail had one of the top 50 clusters of the virus within the United States, with 187 residents and 78 staff members testing positive for the virus and 587 residents in quarantine. [Dkt. No. 23] at 18. As defendant points out, the conditions at the D.C. Jail have been so dire that DOC correctional officers took the extraordinary step of joining as amicus curiae in the class action lawsuit against the jail's leadership. Id. at 19.

Because of defendant's underlying health issues, the coronavirus poses unique threats to him. The World Health Organization has indicated that "those with underlying medical problems like cardiovascular disease [and] diabetes . . . are more likely to develop serious illness" if they contract the coronavirus, see World Health Organization, Coronavirus, available at https://www.who.int/health-topics/coronavirus/coronavirus#tab=tab_1. Although defendant has tested positive for the virus, which suggests that he may have developed some antibodies to

protect him against future infection, this does not end the inquiry. Instead, the analysis shifts to the adequacy of the available medical treatment in defendant's facility. See United States v. Zubkov, No. 14-cr-773, 2020 WL 2520696, at *3 (S.D.N.Y. May 18, 2020). As demonstrated by defendant's reports of his treatment, and confirmed by the descriptions of the conditions in the D.C. Jail in the successful class action filed against the DOC, the treatment available in defendant's facility has been inadequate. Defendant was placed under observation for coronavirus symptoms for only 10 days, and was then returned to his unit. Despite his positive test result, he is not scheduled to receive follow-up care for another three months. Although the D.C. Jail has been ordered to take additional measures to protect inmates from the coronavirus, those changes will not occur overnight, and defendant remains at risk in the meantime. These factors, coupled with defendant's unique history, service of almost 30 years in prison for offenses committed at an extremely young age, and subsequent rehabilitation constitute extraordinary and compelling reasons warranting a sentence reduction.

U.S.S.G. § 1B1.13 also states that before reducing a defendant's term of imprisonment, a court should conclude that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Id. Defendant, who has a near perfect disciplinary record from his time in prison, does not present such a danger. A clinical psychologist who evaluated defendant in March of this year concluded that he is not a long-term public safety risk, a conclusion which is confirmed by the USPC's decision to grant defendant parole. Although the government argues that defendant may pose a danger to the public because he tested positive for the coronavirus earlier this year, the Court will order that defendant be quarantined for 14 days before release, which should eliminate this concern.

8

Defendant's release plan is among the most comprehensive the Court has seen. Upon release, defendant will reside with his aunt, Maria Pantoja, at her home in Haines City, Florida, which is in close proximity to many other members of defendant's family, all of whom have expressed their eagerness to support him in his transition. The United States Probation Office has spoken with Ms. Pantoja and does not object to defendant's release to her custodianship. Ms. Pantoja has expressed her willingness to travel to the District of Columbia to accompany defendant on the train to Florida, and the Court will order that she do so. Defendant's counsel report that they have coordinated with several service providers in Haines City who will assist defendant with accessing educational or vocational training, employment, counseling, and medical services. Moreover, the Court will modify defendant's conditions of supervised release to require him to remain on home confinement in his aunt's home, with limited exceptions, until the date his term of incarceration would otherwise have expired.[3]

Finally, the factors set forth in 18 U.S.C. § 3553(a) also support release. Defendant has already served almost 30 years in prison for offenses committed when he was 16 and 20 years old. During that time, he has undergone a significant transformation, as evidenced by the positive reports from his case managers, his lack of a meaningful disciplinary record, and the USPC's decision to release him on parole. There is no indication that defendant poses a risk to the public, and reducing defendant's sentence to time served will not diminish the seriousness of his offense or respect for the law. The lengthy sentence defendant has served has already provided the necessary general and specific deterrence. Moreover, for his District of Columbia conviction, defendant will remain under parole for the rest of his life, which will require compliance with

---

[3] Defendant consents to this modification. [Dkt. No. 23] at 2 n.3.

strict conditions, including maintaining regular contact with a probation officer. [Dkt. No. 23-19].

Although defendant has only recently begun to serve the 41-month sentence imposed by this Court, his counsel correctly points out that he would likely have already completed this sentence had there not been significant changes to the parole process during his period of incarceration. Specifically, when defendant was sentenced in District of Columbia, the District of Columbia Parole Board had jurisdiction over him. During that time,

> [s]entencing judges . . . set sentences with the knowledge that the D.C. Board was likely to release inmates, given good behavior, immediately upon or soon after reaching eligibility. The sentencing scheme, at the time, required sentences to be given in a range, with parole eligibility at the smaller 'front number' and mandatory release at the larger 'back number,' which was typically three times the front number. Consequently, judges sentenced inmates with the intended term to be served at the front number, assuming release on parole at that number.

Sophia Browning, Three Ring Circus: How Three Iterations of D.C. Parole Policy Have Up to Tripled the Intended Sentence for D.C. Code Offenders, 14 Geo. J.L. & Pub. Pol'y 577, 579 (2016). In accordance with this sentencing scheme, defendant was sentenced to 15 years to life imprisonment. This suggests that his sentencing judge expected that he would serve approximately 15 years in prison before obtaining parole; however, because jurisdiction over parole determinations for those serving sentences for District of Columbia code violations was subsequently transferred to the USPC, which "severely disadvantaged D.C. inmates," id. at 585, defendant has served almost twice that sentence. Had these changes to the parole process not occurred, defendant would likely have begun serving his federal sentence in the mid-2000s, and would have been released long ago.

Moreover, although defendant's federal sentence may have been appropriate at the time it was imposed, "the Court's analysis is different in current circumstances. Due to the COVID-19

pandemic, the 'history and characteristics of the defendant' and the 'need . . . to provide the

defendant with needed . . . medical care,' . . . now weigh heavily in favor of [defendant's]

release, given the health risk that continued incarceration poses to him." United States v. Pena,

No. 15-cr-551, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020). Accordingly, an evaluation of

the § 3553(a) factors confirms that reducing defendant's sentence to time served to be followed

by a three-year term of supervised release, a portion of which will be served in home

confinement with electronic monitoring, results in a sentence sufficient but not greater than

necessary to serve the statutory purposes of sentencing under 18 U.S.C. § 3553(a).

IV.

For the foregoing reasons, defendant's Motion will be granted by an Order to be issued

alongside this Memorandum Opinion.

Entered this ~~22~~ ᴺᴰ day of June, 2020.

Alexandria, Virginia

/s/ _Leonie M. Brinkema_
Leonie M. Brinkema
United States District Judge